UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
LARRY CARTER,                                    **MEMORANDUM & ORDER**

                    Plaintiff,                   13-CV-4631 (KAM)

-against-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.
-------------------------------------X
**MATSUMOTO, United States District Judge:**

          Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3),

plaintiff Larry Carter ("plaintiff") seeks judicial review of the

final decision of the Commissioner of Social Security ("defendant"

or "Commissioner") denying his applications for Disability

Insurance Benefits ("DIB") under Title II of the Social Security

Act ("the Act") and for Supplemental Security Income ("SSI") under

Title XVI of the Act.

          The parties have cross-moved for judgment on the

pleadings under Federal Rule of Civil Procedure ("Fed. R. Civ.

P.") 12(c). For the reasons stated below, the Commissioner's motion

is GRANTED and plaintiff's motion is DENIED.

**BACKGROUND**

*I. Factual Background*

     A.   *Plaintiff's Non-Medical History*

          Plaintiff was born on November 30, 1965. (Tr. 55, 135,

142.) He is a high school graduate. (Tr. 55-56, 198.) Plaintiff

earned credits at the School of Visual Arts in 1985 and at DeVry University in 2000, but has no other higher education. (Tr. 256.) As of his June 8, 2012 hearing, plaintiff resided at a New York City shelter in Queens. (Tr. 55.) He testified that he was single and had no children or dependents. (*Id.*)

For much of his working life, plaintiff has found steady employment in the food service industry. (*See* Tr. 56-57, 198, 228-235, 256-257.) At his hearing before the ALJ, plaintiff testified that he had worked as a cook or in a related role for around 20 years. (Tr. 57.) According to his testimony, he was last working as a cook until sometime in 2010, when he was terminated. (Tr. 56-57.) He also testified that he was currently in search of employment but, due to his injuries, the job needed to be "something seated down, a desk job." (Tr. 58.) When asked by the ALJ if he could "handle" a desk job if one were offered to him, plaintiff replied "I'd have to." (Tr. 62.) Plaintiff testified that he had been in receipt of New York State unemployment insurance benefits, although the record is inconsistent as to when those payments began. (*See* Tr. 56, 144, 151-53.)

In an official "Function Report" completed and signed by plaintiff on November 11, 2011, plaintiff provided a lengthy account of his daily activities (Tr. 205-217.) Plaintiff's activities consisted of, among other undertakings, a daily rehabilitative routine "to promote regeneration of los[t] muscle

tissue due to malnutrition." (Tr. 207.) Plaintiff was unable to use a shower because of his concerns about maintaining his balance, but was able to "wash up or take a bath in [his] own residence." (*Id.*) He stated that he was well-nourished while working but that due to unemployment, he lost 8-10 pounds and muscle in his right lower leg from the lack of adequate nutrition caused by living in a shelter. (*Id.* at 208.) He did not take any medications. (*Id.*) Plaintiff reported that, with the necessary nutritional support, he could go for a walk alone to the library or to see a doctor. (Tr. 209.) He stated that he had to "work out or train due to an old injury," specifically trauma to the right tibia/fibula. (*Id.*)He walked and used public transportation to travel. (*Id.*) When he did not go out, "it would be due to arthritis pain or a lack of food, nutrition." (*Id.*) Plaintiff did not drive due to his injury but also because he had never taken a road test. (Tr. 210.)

Plaintiff listed his former (pre-injury) hobbies and interests as martial arts and playing sports. (*Id.*) Plaintiff has continued his training in these pursuits, but not at his former level. (*Id.*) He no longer runs and attributed his inability to continue training to economic hardship. (*Id.* 210-11.) Although plaintiff continued to interact with his family and friends, his social activities had changed. (*Id.* 211.) He attributed the changes to "malnutrition and loss of muscle and a pre-existing diagnosis of arthritis," among other health concerns. (*Id.*)

*Medical Evidence in the Administrative Record*

## 1.   **Plaintiff's Treating Sources**

*Lennox Hill Hospital*

On July 20, 2011, plaintiff arrived at the Lenox Hill Hospital complaining of right leg pain and some difficulty walking, which he attributed to arthritis and poor diet. (Tr. 176.). Plaintiff requested follow-up x-rays of his right tibia/fibula, which had a rod in place due to a prior injury. (Tr. 177.) He told the attending physician that he was staying in a shelter without access to medical care, and that he took no medication but had been using a brace for support. (Tr. 177.) According the hospital report, plaintiff appeared well-developed, well-nourished, and in no acute distress. (Tr. 178.) There was a healed scar and deformity over his lower right leg, as well as erythema – an abnormal redness of the skin due to capillary congestion – caused by use of a leg brace. (*Id.*) Plaintiff's gait was normal. (*Id.*)

An x-ray of plaintiff's right tibia and fibula performed on the same day showed chronic fracture deformities with an indwelling tibial rod. (Tr. 179.) Plaintiff was diagnosed with lower leg pain and discharged. (Tr. 180.)

On September 16, 2011, plaintiff returned to Lenox Hill Hospital, complaining of chest and lower back pain. (Tr. 163.) According to the treatment notes of emergency department physician Dr. Soma Pathak, plaintiff reported that his lower back pain had

begun gradually and that the symptoms were constant. (*Id.*)

Plaintiff described the pain as "aching" and rated his pain at a

three out of ten on a numeric pain rating scale. (*Id.*) Plaintiff

had myalgia and arthralgia, but no muscle weakness. (Tr. 166.)

Plaintiff had no clubbing, cyanosis,[1] or edema[2] in his extremities

and showed a normal range of motion. (Tr. 167.) A chest x-ray

performed on the same day revealed his heart to be within normal

limits in transverse diameter and no acute infiltrates. (Tr. 168.)

Dr. Pathak diagnosed plaintiff with lower back pain and an upper

respiratory infection (Tr. 169.)

On March 28, 2012, plaintiff walked to the hospital from

a shelter to request x-rays of his chest, abdomen, and pelvis/hips.

(Tr. 355-356.) Plaintiff told Justin Mazur, M.D., the emergency

department physician, that he needed the x-rays to prove that he

was healthy in order to obtain work (Tr. 356.) Plaintiff informed

Dr. Mazur that he was seeking to obtain work with help from the

shelter where he lived. (*Id.*) The report notes that plaintiff had

been limping as a result of hip trauma sustained when he was 17,

and that his gait was abnormal. (Tr. 357.) Plaintiff denied

myalgia, as well as any new trauma or injury to his back or pelvis.

(Tr. 357-358.) He reported muscle weakness and joint and back pain.

---

[1] A bluish discoloration due to poor circulation or inadequate
oxygenation of the blood. *See Cyanosis*, Stedman's Medical Dictionary.
[2] "An accumulation of an excessive amount of watery fluid in cells or
intercellular tissues." *See Edema*, Stedman's Medical Dictionary.

(Tr. 358.) Plaintiff exhibited normal ranges of motion in the extremities and had no cyanosis or edema. (*Id.*) Dr. Mazur ordered that x-rays be performed on plaintiff's chest, abdomen, and hips. (*Id.*) The x-rays were carried out on the same day.

The chest x-ray revealed clear lungs, no pleural effusions and heart size within normal limits. (Tr. 359.) X-rays of plaintiff's hips and pelvis suggested an impingement of the right hip, while his left hip demonstrated "marked abnormality" and "severe . . . osteoarthritis with underlying dysplastic appearance." (Tr. 362.) The acetabulum and femoral head[3] appeared dysplastic (misaligned) with obliteration of the joint space, subchondral cystic changes,[4] and osteophytes.[5] (*Id.*) At the right hip there was a bony prominence visible at the junction of the femoral head and neck, which suggested an impingement. There was no acute fracture or dislocation. (*Id.*)

*Manhattan's Physician Group*

On August 25, 2011, plaintiff visited an office of Manhattan's Physician Group ("MPG"), requesting several referrals.

---

[3] "The hip is a ball-and-socket joint. The socket is formed by the acetabulum, which is part of the large pelvis bone. The ball is the femoral head, which is the upper end of the femur (thighbone)." *Femoroacetabular Impingement (FAI)*, American Academy of Orthopedic Surgeons, http://orthoinfo.aaos.org/topic.cfm?topic=A00571.
[4] "A subchondral cyst is a cyst that is situated beneath cartilage." *Kearney v. Barnhart*, No. 05-CV-1860, 2006 WL 1025307, at *1 n.1 (E.D.N.Y. Apr. 17, 2006).
[5] An osteophyte is a pathological bony outgrowth. *See Osteophyte*, http://www.merriam-webster.com/medlineplus/osteophyte.

(Tr. 277.) Plaintiff had multiple complaints, including "unclear w[eight] loss." (*Id.*) Plaintiff informed James Nguyen, M.D. that he had chronic pain, unequal leg length, osteoarthritis and weight loss. He further disclosed that he had been using a leg brace for ten years and that he practiced martial arts. (*Id.*) The doctor noted that it was unclear why plaintiff was using a brace. (*Id.*) Plaintiff appeared to Dr. Nguyen to be "well nourished and well developed" and in no apparent distress. (Tr. 278.) Both plaintiff's right and left knees demonstrated full range of motion, and neither exhibited joint deformity, heat, swelling, erythema, or effusion. (*Id.*) A physical examination found right calf atrophy and noted fibula bulge secondary to surgery. There was no soft tissue tenderness or erythema. (*Id.*) The doctor diagnosed osteoarthritis and chronic bilateral leg/hip pain, for which – at plaintiff's request – Dr. Nguyen referred him to physical therapy. (*Id.;see also* Tr. 306-307.) The doctor also diagnosed unclear weight loss, for which he referred plaintiff for a complete nutritional assessment. (Tr. 278.) Finally, following a diagnosis of unequal leg length, the doctor made referrals to a podiatrist and for a possible heel lift. (*Id.*)

On January 19, 2012, plaintiff visited MPG again to request a chest x-ray. (Tr. 347.) He required a chest x-ray for his shelter resident health record, as he had tested positive on a PPD skin test (a method of diagnosing tuberculosis) in 2010.

(*Id.*) The chest x-rays revealed no active pulmonary disease (Tr. 349.)

Plaintiff returned to MPG on February 9, 2012, requesting a referral to a nutritionist. (Tr. 345.) He told the doctor that he had gained five pounds in one month. (*Id.*) He was referred to a nutritionist. (Tr. 346.)

On February 14, 2012, plaintiff returned to MPG complaining of pain in his left knee. (Tr. 341.) The injury stemmed from a tibia-fibula fracture that occurred when plaintiff was struck by a motorcycle at age 17. (*Id.*) Plaintiff described the pain as aching and dull. (*Id.*) He said that movement and walking aggravated the pain. (*Id.*) There were no associated symptoms or relieving factors. (*Id.*) Plaintiff requested an x-ray. (*Id.*) Plaintiff was examined by Julie Morgan, M.D., who found him to be well nourished and developed, and in no apparent distress. (Tr. 342.) Dr. Morgan diagnosed degenerative joint disease (DJD) of the hip and malunion of fracture.[6] (*Id.*) Dr. Morgan ordered x-rays of plaintiff's hip and knee. (*Id.*) The x-rays were carried out the same day. (Tr 343-344.)

The x-ray of plaintiff's left hip showed "severe arthritic changes" and "near-complete obliteration of the joint

---

[6] Malunion "is a clinical term used to indicate that a fracture has healed, but that it has healed in less than an optimal position." *See* https://my.clevelandclinic.org/services/orthopaedics-rheumatology/diseases-conditions/foot-ankle-fractures-malunion.

space." (Tr. 343.) There was marked flattening deformity of the femoral head, which was laterally dislocated. (*Id.*) Subchondral sclerosis and cyst formation were noted on both sides of the hip joint, in addition to a small bony spur. (*Id.*) There were no acute fractures or dislocations and the soft tissues were within normal limits. (*Id.*)

The x-ray of plaintiff's right knee revealed moderate to severe degenerative changes to the knee joint, with moderate to severe medial and mild to moderate lateral join space narrowing. (Tr. 344.) Additionally, there were subchondral sclerosis and cyst formation in the medial joint compartment. (*Id.*) The soft tissues were within normal limits (*Id.*)

On April 18, 2012, plaintiff called MPG seeking a referral for his "knee problem." (Tr. 352.)

### 2. Consultative Medical Sources

*Antero Sarreal Jr., M.D., Orthopedist*

After a referral by the Division of Disability Determination, Dr. Sarreal conducted an independent orthopedic examination of plaintiff on December 7, 2011. (Tr. 331-334.)

First, plaintiff related his extensive medical history, in particular a right leg fracture of the tibia and fibula. He reported that he had been struck by a motorcycle at age 17. (Tr. 331.) Plaintiff mentioned that he had a steel rod embedded into the tibia shaft. (*Id.*) Owing to the fracture of his right leg,

plaintiff's right lower extremity was about three-and-a-half inches shorter than the left. (*Id.*) Plaintiff had undergone reconstructive surgeries on his right leg in 1985 and 1987. (*Id.*)

Plaintiff reported daily pain in his right knee and leg, which he rated as a six to seven on a scale of ten. (*Id.*) He told Dr. Sarreal that the pain was aggravated by his activities, as well as changes in the weather. (*Id.*) Plaintiff said that his practice of meditation helped to relieve some of the pain but that he was not taking any painkillers. (*Id.*) Plaintiff also claimed that at times he could walk a distance of ten blocks, and could stand for about two hours or more depending on the pain he felt in his knee and leg. (*Id.*)

Plaintiff also reported that he had been experiencing back pain for the past one-and-a-half to two years. (*Id.*) He graded the pain at a four out of ten, and described it as a "daily, persistent, crampy ache, dull to sharp at times" with radiation to the lower extremities. (*Id.*) Plaintiff reported that the back pain was aggravated by his activities. (*Id.*)

Dr. Sarreal found plaintiff to be cooperative and in no acute distress. (Tr. 333.) On examination, plaintiff walked with a limp due to a shortened right extremity. (*Id.*) Although plaintiff attempted to walk on his heels and toes, he had difficulty doing so. (*Id.*) Squatting caused pain in his right leg and knee. (*Id.*) When standing, plaintiff's right lower extremity was shorter than

the left and his right knee was abducted laterally.[7] (*Id.*) Although plaintiff did not use a cane, he required the use of a plastic leg support for his right leg. (Tr. 332-333.) Plaintiff related that the device had been prescribed to him in 1991 and was in need of a replacement. (Tr. 332.) Plaintiff needed no assistance changing for the exam, or getting on and off the exam table. (Tr. 333.) He was able to rise from a chair without difficulty. (*Id.*)

Dr. Sarreal found that plaintiff's hips retained a full range of bilateral movement. (*Id.*) His right knee exhibited tenderness and swelling, and there was increased sensitivity to touch on the right posterior knee. (*Id.*) His right knee was capable of -30 degrees extension. (*Id.*) The left knee had full ranges of motion. (*Id.*) Plaintiff's right knee had intact flexion to 110 degrees; his left knee had full ranges of motion. (*Id.*) The right leg was measured one inch shorter than the left. (*Id.*) Dr. Sarreal found no muscle atrophy, joint effusion, inflammation, or instability. (334.)

Dr. Sarreal diagnosed plaintiff with a status post right tibia/fibula fracture operation, with shortening of the right lower extremity; low back derangement; and right knee derangement. (Tr. 334.) Dr. Sarreal opined that plaintiff had moderate to marked

---

[7] "Abduction" refers to the movement of a body part away from the median plane of the body. *See* http://www.medilexicon.com/medicaldictionary.php?t=74.

limitation in regard to: lifting and carrying heavy objects, pushing and pulling, prolonged standing, climbing stairs, squatting, long distance ambulation, kneeling, and squatting. (*Id.*) Plaintiff had moderate limitation in frequent bending, and a mild limitation in prolonged sitting. (*Id.*)

*Matthew S. Hepinstall, M.D., Orthopedist*

Dr. Hepinstall examined plaintiff on July 11, 2012, for complaints of left hip and right knee pain. (Tr. 380-385.) Dr. Hepinstall's report noted the history of plaintiff's impairments, in particular the right tibia-fibula fracture and the ensuing corrective procedures. (Tr. 382.) A "severely abnormal gait" was attributed to a deformity of the right leg and leg-length discrepancy. (*Id.*) Plaintiff stated that he had developed increasingly severe pain in his knee and left hip, of which the latter was the more painful. (*Id.*) He also stated that the progression of his symptoms over the past year was due to a change in his living situation, in particular his continued stay in a homeless shelter. (*Id.*) Dr. Hepinstall noted that plaintiff was "markedly limited in his function due to severe pain and stiffness at the left hip and the right knee, although he tries to maintain an active lifestyle given his youth." (*Id.*)

Dr. Hepinstall determined that plaintiff was 73 inches tall and weighed 185 pounds. (Tr. 383.) He was "generally well appearing," and alert with a normal mood and affect. (*Id.*)

Plaintiff had mild pelvic obliquity related to leg-length discrepancy. (*Id.*) His right leg was functionally shorter than his left, related to actual leg-length discrepancy at the tibia-fibula malunion, as well as flexion deformity at the right knee. (*Id.*) He had only mild discomfort with lumbar range of motion and no loss of motion. (*Id.*) He had a relatively pain-free range of motion of the right hip, while the left hip range of motion was markedly restricted and painful. (*Id.*) The left knee range of motion was relatively unrestricted and painless; a complete exam of the knee, however, was limited by the stiffness in plaintiff's left hip. (*Id.*) The range of motion of the right hip was relatively unrestricted and painless. (*Id.*) Plaintiff had a longitudinal surgical scar at the right knee. (*Id.*) The right knee flexed only to -30 or -35 degrees, apparently because of an impingement of the rod on the distal femur. (*Id.*) There was no ligamentous instability, but some pseudo-laxity associated with underlying medial bone and cartilage loss. Plaintiff had tricompartemental tenderness, worse medially. (*Id.*) There was some deformity associated with prior fracture over the right distal aspect of the right leg. (*Id.*) Plaintiff exhibited distal tibial varus, but there was no frank cellulitis, erythema or tenderness. (*Id.*) There was some diffuse apparent swelling, which Dr. Hepinstall believed was likely due to overlap of the bone ends. (*Id.*)

An x-ray taken of plaintiff's pelvis in May 2012 revealed that his left hip had a dysplastic appearance and the joint space was obliterated. (Tr. 380.) There was visible sub-articular cystic changes, sclerosis and osteophyte formation. (*Id.*) Dr. Hepinstall noted joint space narrowing, subchondral sclerosis, and productive changes of the right hip. (*Id.*) As for the right knee, Dr. Hepinstall's evaluation found "severe tricompartemental joint space narrowing with productive changes, more prominent in the medial tibeiofemoral compartment." (*Id.*)

Further x-rays were performed and analyzed on the same day. A scan of the right knee revealed severe varus osteoarthritis with tricompartmental involvement. (Tr. 383.) The x-ray also showed the prominence of an intramedullary nail extending a couple of centimeters proximal to the appropriate insertion site and abutting both the patellar tendon and the distal femur, thereby limiting extension. There was also bone-on-bone change medially and large productive osteophytes. (*Id.*) Dr. Hepinstall opined that the x-ray of the left hip demonstrated severe osteoarthritis with sublaxation of the joint with creation of a pseudoacetabulum and fragmentation of the femoral head. (*Id.*) There was also severe shortening at the left hip due to the bone collapse and subluxation of the hip joint. (*Id.*) The sacroiliac joints, right hip and lumbar spine appeared relatively preserved. (*Id.*)

Dr. Hepinstall diagnosed plaintiff with multiple severe musculoskeletal conditions, including chronic fracture deformity of the right tibia/fibula distally (with history of infection), severe post-traumatic osteoarthitris of the right knee, and severe osteoarthritis of the left hip with collapse of the femoral head, erosion of the acetabulum, and subluxation. (*Id.*) Dr. Hepinstall opined that, due to plaintiff's advanced bone-on-bone change and joint destruction at the hip and knee, plaintiff was "not expected to obtain significant relief from conservative measures [and] will require left hip and right knee replacement to optimize his function." (*Id.*) The report recommended that plaintiff undergo blood tests to exclude the possibility of residual infection. (Tr. 384.) Dr. Hepinstall summarized his report in a short letter dated September 27, 2012. (Tr. 385.) A copy of Dr. Hepinstall's report was submitted to the Appeals Council as additional evidence on September 21, 2012.

*Hospital For Special Surgery*

Plaintiff checked in to the Department of Radiology and Imaging at the Hospital For Special Surgery on March 13, 2013 for a series of x-rays. (Tr. 372.) According to the interpretation of Carolyn Sofka, M.D., the x-rays disclosed four impressions. (Tr. 377.) First, there were signs of healed non-acute post-traumatic fracture deformities of the right tibia and fibula with resultant hindfoot varus on the right. (*Id.*) Second, the x-rays were

15

consistent with osteoarthiritis in the right knee, severely affecting the medial compartment, with patella alta. (*Id.*) Third, there was osteoarthritis of the right hip with features of underlying cam-type femoroacetabular impingement. (*Id.*) Finally, there was evidence of severe osteoarthritis in the left hip, apparently due to underlying dysplasia with superolateral subluxation and near-complete chronic dislocation of the femoral head. (*Id.*)

The x-rays and Dr. Sofkya's interoperation were later submitted to the Appeals Council for its consideration. (Tr. 13.)

### 3. Other Documentary Evidence

*Function Report*

Plaintiff made several statements regarding his health in the official Function Report. He described his lifting capability as still "fairly within [his] normal capacity," albeit affected by malnutrition and hunger. (Tr. 211.) Standing, plaintiff stated, was made easier by his martial arts background and familiarity with meditative techniques. (*Id.*) Plaintiff would experience pain after standing for prolonged periods, but claimed to have a high metabolism and level of tolerance. (*Id.*) He described himself as "capable" of walking, but wore a brace on his lower right leg. (Tr. 212-213, 216.) Plaintiff's ability to walk was hindered by hunger, dehydration and (when active) the pain of his arthritis. (Tr. 212.) Sitting was a "non-issue" for plaintiff,

"depending on the length of time, maybe some constriction or tightening of the lower lumbar musculature." (Tr. 212.) These symptoms could be countered, however, by stretching and hydration. (*Id.*) His ability to climb stairs depended on the number of flights in question: one to seven was "no problem," but more than 10 was a problem. (*Id.*) Kneeling was always an issue when he plaintiff had been overly-active thought the day, due to his leg-length differential and the metal rod in his right tibial shaft. (*Id.*) Squatting likewise could be an issue if plaintiff was dehydrated or the arthritis was "flaring up." (*Id.*)

Plaintiff reported that he had been diagnosed with osteoarthritis in the hip-femur region. (Tr. 214.) This, he claimed, was due to a structural imbalance cause by past reconstructive operations. (*Id.*) The associated pain began in 2011, which plaintiff attributes to changes in his "regular eating and training routine." (*Id.*) At the time of the form's completion, plaintiff was not being treated for the pain because he preferred to address "the underlying cause of [the] problem." (*Id.*) Plaintiff required access to training equipment to rebuild muscle in his right leg that he had lost "due to severe economic hardships and as a direct result [of] a reduction in necessary food and supplements." (*Id.*) The pain itself could range from a mild inflammation to a sharp pain, depending on plaintiff's level of activity that day. (*Id.*) Plaintiff stated that he had developed a

tolerance for the pain with the use of meditative techniques and exercises. (*Id.*) The primary locations of the pain were the "major muscles or joints involved in activity." (Tr. 215.) Plaintiff also noted that the length or duration of the pain had "diminished" in the prior year due to a "specific training program" he had undertaken. (*Id.*) The frequency of the pain depended on the circumstances; some activities, such as overexertion and running, tended to induce the pain. (*Id.*) Plaintiff did not take any medication to relieve his pain. (*Id.*)

*Work History Report*

In the remarks section of a 2011 Work History Report, plaintiff outlined his extensive medical history. (Tr. 235.) Plaintiff was involved in a collision with a motorcycle, suffering a fracture of his right tibia/fibula at the age of 17. (*Id.*) In the two reconstructive surgeries that followed, plaintiff underwent a bone graft procedure in which doctors removed an inch of scar tissue at the tibia/fibula and applied a metal plate on his tibia to promote healing. (*Id.*) Plaintiff claimed that his leg length discrepancy grew from one to three inches due to a growth spurt in 1986-1987. (*Id.*) Between the ages of 35 and 40, plaintiff stated that his ability to run gradually diminished due to "overexertion-overuse" and the wearing away of the cartilage in his hip. (*Id.*) Plaintiff states that it was at around this time that he was first diagnosed with arthritis in his left hip. (*Id.*)

### 4. Plaintiff's Testimony

At the hearing before the ALJ on June 8, 2012, plaintiff testified that his primary physician was Dr. Julie Morgan, whom he visited weekly. (Tr. 58.) The cause of his most recent visit had been "the atrophy or . . . muscular problems" that he was going through. (Tr. 59.) Plaintiff attributed those problems to an "old prior injury" and the "issues of malnutrition" he faced in the shelter system. (*Id.*) Plaintiff testified that he suffered from a fracture in his left hip, caused by the weight of the "all the legal documentation" he carried with him. (Tr. 63.)

Plaintiff testified that he was capable of walking "about four to five blocks," before having to stop and stretch. (Tr. 64.) He also told the ALJ that he could stand in one position for 20 minutes before having to sit down due to pain. (*Id.*) Plaintiff testified that he had difficulty sitting in a chair and could sit for only three or four minutes before he needed to get up due to the pain. (*Id.*) When asked by the ALJ whether he was physically capable of performing full-time sedentary work, plaintiff responded: "If I was in a position and I had to take it I would. I'd have to do it." (Tr. 65.) Plaintiff testified that, although he had no issues with dressing himself, he was unable to take showers "because of the undifference [sic] in leg length; issues of standing in the shower and soap." (*Id.*) Finally,

plaintiff testified that he was not taking any medication at the time of the hearing. (*Id.*)

## II. *Procedural History*

Plaintiff filed applications for DIB and SSI on September 26, 2011 and September 27, 2011, respectively. (ECF No. 23, Administrative Transcript ("Tr.") 31, 71.) Plaintiff claimed to be disabled due to severe atrophy and muscle degeneration in the right knee and leg; degenerative knee impairment; and a metal rod in his knee. (Tr. 197.) The alleged onset of disability was initially filed as January 1, 2010, but was later amended to July 20, 2011. (Tr. 31, 135, 142.) Accordingly, the relevant period for disability determination is from July 20, 2011 through July 3, 2012, the date of the Administrative Law Judge's decision. (Tr. 41.)

The Social Security Administration (the "SSA") denied both applications on the basis that plaintiff was not disabled within the meaning of the Act. (Tr. 71-72, 77-87.) On February 1, 2012, plaintiff requested a hearing before an Administrative Law Judge. (Tr. 89.)

On June 8, 2012, plaintiff appeared with his non-attorney representative before Administrative Law Judge ("ALJ") Wallace Tannenbaum. (Tr. 52-68). In a decision issued on July 3, 2012, the ALJ concluded that plaintiff was not disabled from July 20, 2011 through the date of the decision and was therefore not

entitled to either DIB or SSI. (Tr. 40-41.) Specifically, the ALJ found that, despite his various severe impairments, plaintiff had the Residual Functional Capacity ("RFC") to perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). (Tr. 35.)

Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA's Appeals Council on July 26, 2012. (Tr. 26.) By notice dated June 18, 2013, plaintiff was informed that the Appeals Council had denied his request for review. (Tr. 8-11.) Plaintiff subsequently submitted additional medical records. (Tr. 2.) On August 12, 2013, the Appeals Council set aside its earlier order, but once again denied plaintiff's request for review and adopted the ALJ's decision as the final decision of the Commissioner. (Tr. 1-7.)

Plaintiff subsequently filed this timely action. The Commissioner filed a memorandum in support of her motion for judgment on the pleadings. (ECF No. 19, Memorandum of Law in Support of the Defendant's s Motion for Judgment on the Pleadings ("Def. Mem.").) Plaintiff filed a memorandum in support of his own cross-motion for judgment on the pleadings. (ECF No. 21, Memorandum of Law in Support of Cross-Motion ("Pl. Mem.").) The Commissioner subsequently replied. (ECF No. 22, Reply Memorandum ("Def. Reply").)

**DISUCSSION**

## I. Applicable Legal Standards

### A.   Standard of Review

In reviewing a decision of the Commissioner, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A district court does not decide *de novo* whether the unsuccessful claimant is in fact disabled and may not substitute its own judgment for that of the ALJ, even if the court might justifiably have reached a different result. *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." (citation omitted)).

The court's narrow role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

B.   *The Commissioner's Five-Step Analysis of Disability Claims*

To receive DIB and SSI, a claimant must be found disabled within the meaning of the Act. "Disability" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 1382c(a)(3)(A), 423(d)(1)(A). A physical or mental impairment is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* §§ 1382c(a)(3)(D), 423(d)(3). To be found disabled, a claimant's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 1382c(a)(3)(B), 423(d)(2)(A).

The SSA has established a five-step sequential analysis to guide disability determinations. *See* 20 C.F.R. §§ 404.1520, 416.920. If it can be determined that the claimant is disabled or not disabled at any step of the evaluation, the inquiry ends and

the Commissioner issues her decision. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If so, the claimant is not disabled. If not, the Commissioner moves to the second step to determine whether the claimant suffers from a "severe impairment" that meets certain duration requirements. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* §§ 404.1520(c), 416.920(c). If the impairment is not severe, the claimant is not disabled and his claim will be denied.

If the claimant has a severe medical impairment, the analysis moves to step three, in which the Commissioner compares the claimant's impairment to the impairments listed in the regulations. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairment "meets or equals" one of the listed impairments, he is deemed *per se* disabled irrespective of his "age, education, and work experience." *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *see also Id.* §§ 404.1520(d), 416.920(d).

If the claimant does not have a listed impairment, the Commissioner is required to assess the claimant's residual functional capacity ("RFC") before proceeding to steps four and

five. A claimant's RFC is defined as the "most [the claimant] can still do" despite his physical and medical limitations. *Id.* §§ 404.1545(a)(1), 416.945(a)(1). In determining a claimant's RFC, the "focus is on what work, if any, a claimant can perform after taking into account his limitations." *McEachin v. Astrue*, No. 08-CV-13, 2010 WL 626820, at *9 (E.D.N.Y. Feb. 23, 2010).

The Commissioner then moves to step four, where she must determine whether the claimant's RFC is sufficient to perform his "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the Commissioner finds that the claimant can perform his past relevant work, the claimant is not disabled; if the claimant cannot perform his past relevant work, the Commissioner moves to step five.

The claimant bears the burden of proving disability in steps one through four of the sequential analysis. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant meets his burden in proving disability for each of the first four steps, the burden shifts to the Commissioner on the fifth and final step, where she must determine whether the claimant is nonetheless capable of adjusting to perform any other gainful work that exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work, he is not disabled; if he can make no such adjustment, he is disabled. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## II. The ALJ's Disability Determination

The ALJ first resolved a threshold matter by finding that plaintiff met the insured status requirements of the SSA. (Tr. 33.) Proceeding to the first step of the five-step sequential analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since July 20, 2011, the amended onset date. (*Id.*)

At step two, the ALJ found that the plaintiff suffered from the following severe impairments: "status post right tibia/fibula fracture operation with shortening of the right lower extremity, degenerative changes of the right knee, impingement of the right hip and left hip osteoarthritis." (Tr. 34.) The ALJ did not find sufficient evidence to support the claimed severe impairments of iron deficiency and malnutrition. (*Id.*)

At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or equaled the criteria of any of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.*) In particular, the ALJ found — after considering the entire evidence of record, including the opinion of orthopedic consultant Dr. Sarreal — that the claimant's severe impairments did not equal or meet the requirements of Listing 1.02 (major dysfunction of a joint). (*Id.; see also Id.* 331-34.)

Before proceeding to steps four and five, the ALJ considered the entire record and found that plaintiff had the RFC to perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). (Tr. 35-39). The ALJ accepted that plaintiff's impairments could reasonably be expected to cause the alleged symptoms, specifically pain in the hips and lower extremities resulting in restrictions on and difficulties with prolonged standing and walking, as well as the inability to lift and carry heavy objects. (Tr. 35.) The ALJ found, however, that plaintiff's statements regarding the intensity, persistence and limiting effects of the symptoms were not credible insofar as they were inconsistent with the RFC assessment. (*Id.*) The ALJ further concluded that the objective findings in the record did not support plaintiff's claim that his impairments prevented him from performing basic work activities. (*Id.*) He noted that plaintiff's alleged impairments were present while he was working, as well as evidence suggesting that plaintiff stopped working for reasons unrelated to his impairments. (Tr. 39.) The ALJ also noted plaintiff's willingness to work in a sedentary capacity. (*Id.*) The ALJ afforded "greater weight" to the opinion of Dr. Sarreal, the orthopedic specialist who examined the claimant and whose assessment was "reflective of [plaintiff's] ability to engage in work of sedentary exertion." (*Id.*) The ALJ concluded his RFC assessment by finding that plaintiff retained the ability to

"comply with the exertional and non-exertional requirements of basic work related tasks." (*Id.*)

At step four of the sequential analysis, the ALJ accepted that plaintiff's impairments prevented him from performing his past relevant work as a cook. (*Id.*) At step five, the ALJ determined that plaintiff retained the RFC to perform alternative gainful employment within the national economy. (Tr. 40.) In making his determination, the ALJ considered plaintiff's RFC, age, education, and work experience in conjunction with the Medical-Vocation Guidelines, as set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 2, as well as the evidence of the vocational analyst. (*Id.*) The ALJ concluded that plaintiff was not disabled under the Act.

### III. Analysis

Plaintiff seeks remand on three grounds. First, plaintiff alleges error in the ALJ's finding at step three that plaintiff's impairment did not meet or equal impairments delineated in Listing 1.02A, which would have entitled plaintiff to a finding of *per se* disability. Second, plaintiff contends that the ALJ's determination of his RFC was flawed because it did not contain a function-by-function assessment of plaintiff's work-related abilities. Finally, plaintiff argues that "new and material" evidence before the Appeals Council warrants remand.

The Commissioner contends that the ALJ's decision that plaintiff was not disabled under the Act was supported by substantial evidence and based on the correct legal standards.

A.  *Substantial Evidence Supported the ALJ's Finding that Plaintiff Was Not Per Se Disabled Under Listing 1.02A*

Plaintiff first argues that the ALJ erred at step three of his sequential analysis by finding that plaintiff was not *per se* disabled due to major dysfunction of a joint. (Pl. Mem. at 10-13 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.02A).) Plaintiff contends that the ALJ gave insufficient consideration to substantial medical evidence that plaintiff's musculoskeletal disorder was consistent with Listing 1.02A's criteria. (*Id.* at 10.) The Commissioner argues that, because plaintiff failed to satisfy the "effective ambulation" criterion of Listing 1.02A, the ALJ correctly decided that plaintiff was not *per se* disabled. (Def. Mem. at 15-16; Def. Reply at 1-2.)

As noted above, a claimant is entitled to a conclusive presumption that he is disabled if his impairment meets or is medically equivalent to an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant must show that his impairment meets or equals *all* specified criteria of a listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1991). "An impairment that manifests only some of those criteria, no matter how severely, does not

qualify." *Id.* Listing 1.02A, the relevant provision here, reads in full:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.02A.

Thus, the above-described impairment(s) must also result in an "inability to ambulate effectively" in order to meet or equal the listings. In essence, "inability to ambulate effectively" means an "extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.00B(2)(b)(1). "Ineffective ambulation" is defined generally as "having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* Examples of ineffective ambulation include, but are not limited to, "inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as

30

shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.* § 1.00B(2)(b)(2).

Here, the ALJ concluded that plaintiff's impairments did not meet or medically equal any listed impairment, and in particular Listing 1.02 (major dysfunction of a joint). (Tr. 34-35.) The ALJ's rationale focused in part on plaintiff's own statements in the record about his daily activities, including his ability to "use public transportation," "go out alone," "train in his martial arts techniques," "walk up to 10 blocks," and "stand two hours or more." (Tr. 34.) The ALJ recognized that during an orthopedic examination plaintiff "exhibited some limitation in the range of motion of the right of knee." (Tr. 35.) During the same examination, however, the orthopedist determined that plaintiff "had full range of motion of the left knee and full range of motion of the hips bilaterally." (*Id.*) The ALJ did not clarify which criteria in Listing 1.02A plaintiff failed to meet. On the other hand, the ALJ's detailed recital of evidence from the record – in particular the ALJ's discussion of plaintiff's daily activities – supports a finding that plaintiff did not meet the Listing because, *inter alia*, the evidence did not demonstrate plaintiff's "inability to ambulate effectively," as required by Listing 1.02A.

The Second Circuit has instructed that, when deciding whether or not to find a listed impairment, an ALJ should "set

31

forth a sufficient rationale in support of his decision." *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112 (2d Cir. 2010) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)). Nevertheless, "the absence of an express rationale for an ALJ's conclusions does not prevent [the court] from upholding them so long as [the court is] 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.'" *Id.* (quoting *Berry*, 675 F.2d at 469).

Even if the threshold criteria of Listing 1.02A were established here, there is no evidence in the record demonstrating plaintiff's inability to ambulate effectively at any relevant time. On the contrary, substantial evidence supports the conclusion that, despite plaintiff's severe hip and knee impairments, he retained the ability to "ambulate effectively," as that term is defined in the regulations. Accordingly, the court finds that the ALJ did not err in his determination that plaintiff's impairments failed to meet or equal the requirements of Listing 1.02A.

As an initial matter, many of plaintiff's own admissions belie his contention of ineffective ambulation. For example, he disclosed on an official SSA questionnaire that he was able to go outside to "work out or train," walk on his own outside, and use public transportation. (Tr. 209.) On the same form, plaintiff

stated that he was capable of "moderate to competitive" walking, and was able to climb one to seven flights of stairs. (Tr. 212.) Plaintiff also reported to Dr. Sarreal during his December 2011 consultation that he was capable of walking up to ten blocks and could stand for two hours or more, depending on pain in his right knee and leg. (Tr. 331.) Moreover, although plaintiff relied on a lower leg brace for support, there is no evidence that he required a "hand-held assistive device," 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.00B(2)(b)(2) — such as a walker, cane or crutch — at any time. Taken alone or together, plaintiff's admissions are fatal to his claim that he was unable to ambulate effectively. *See Walker v. Astrue*, No. 06-CV-5978 2009 WL 2252737, at *12 (E.D.N.Y. July 28, 2009) (finding a claimant's admissions to an ability "to do some house and yard work, go out alone, shop, socialize and play with her grandchild" were inconsistent with ineffective ambulation); *DiPalma v. Colvin*, 951 F. Supp. 2d 555, 571-72 (S.D.N.Y. 2013) (finding that a claimant could ambulate effectively where he "testified before the ALJ that he carried out activities of daily living" and his doctor "noted that [claimant] used no assistive device"); *Richardson v. Astrue*, No. 10-CV-9356, 2011 WL 2671557, at *9 (S.D.N.Y. July 8, 2011) (finding that a claimant who took "public transportation without assistance," "climb[ed] stairs," and "perform[ed] various household chores" could ambulate effectively, even though he had an abnormal gait

and "his ability to ambulate was moderately to severely impaired"), *report & rec. adopted*, 2011 WL 3477523 (S.D.N.Y. Aug. 8, 2011).

Plaintiff contends that the ALJ erred at step three by affording insufficient consideration to Dr. Sarreal's report. (Pl. Mem. at 12.) Specifically, plaintiff maintains that the ALJ failed to "fully consider the entirety of [Dr. Sarreal's] findings when evaluating the claim at step 3." (Pl. Mem. at 12.) First, the ALJ clearly examined Dr. Sarreal's report closely. The ALJ specifically identified the report as one part of the "entire evidence of record" that he considered in reaching his decision at step three. (Tr. 34.) The ALJ also afforded Dr. Sarreal's report significant weight because Dr. Sarreal "specializes in orthopedics, has examined the claimant, and his assessment [is] reflective of the claimant's ability to engage in work of sedentary exertion." (Tr. 39.)

Although Dr. Sarreal's report provided evidence of plaintiff's various impairments, it is not probative of plaintiff's inability to ambulate effectively. Plaintiff relies on Dr. Sarreal's observations that plaintiff exhibited difficulty walking on his heels and toes and ambulated with a limp, as well as Dr. Sarreal's opinion that plaintiff had a "moderate to marked limitation in . . . prolonged standing, climbing stairs," and "long distance ambulation." (Tr. 334.) Dr. Sarreal noted

34

plaintiff's difficulty with standing and walking for long periods or distances; however, the regulatory definition of "ineffective ambulation" is detailed and demands a showing beyond the findings in Dr. Sarreal's report. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, listing 1.00B(2)(b).

Next, plaintiff asserts that the "activities of daily living" referenced by the ALJ – and discussed above – are "not inconsistent with an impairment of listing level severity." (Pl. Mem. at 12.) Courts in this circuit have consistently held, however, that daily activities of the sort admitted to by plaintiff preclude the necessary finding of ineffective ambulation. *See, e.g.*, *Johnson v. Colvin*, No. 14-CV-2334, 2015 WL 400623, at *12 (S.D.N.Y. Jan. 30, 2015) ("Where . . . a plaintiff has some ambulatory limitations, but regularly engages in the activities of daily living such as cooking, cleaning, and shopping, courts routinely find that the claimant can ambulate effectively."). In short, plaintiff's admitted daily activities constitute substantial evidence supporting the ALJ's determination at step three.

Finally, plaintiff claims that "the medical evidence documents an inability to ambulate effectively." (Pl. Mem. at 11.) As discussed above, the medical evidence demonstrates at most that plaintiff had occasional difficulty and discomfort while walking. Such difficulty and discomfort, however, fall far short of

satisfying the ineffective ambulation criterion of Listing 1.02A. *See Guy v. Astrue*, 615 F. Supp. 2d 143, 161 (S.D.N.Y. 2009) (holding that claimant could ambulate effectively notwithstanding his "discomfort while walking" because he indicated his ability to walk short distances comfortably with a cane); *Marullo v. Astrue*, No. 08-CV-818, 2010 WL 2869577 at *9 (W.D.N.Y. May 4, 2010) (finding that plaintiff had not established ineffective ambulation despite her testimony that she took Tylenol for knee pain, had difficulty walking long distances, and had to sit down when she experienced pain in her legs). Accordingly, the court finds that substantial evidence supported the ALJ's finding that plaintiff was not *per se* disabled under Listing 1.02A.

B.    *The ALJ's RFC Assessment Was Supported By Substantial Evidence*

Plaintiff argues next that the RFC assessment was flawed because the ALJ failed to conduct a function-by-function evaluation of plaintiff's capacity to perform a full range of sedentary work. (Pl. Mem. at 13-14.) The Commissioner argues in response that the ALJ's RFC assessment was supported by substantial evidence in the record and that a function-by-function evaluation was not necessary. (Def. Mem. at 16-22; Def. Reply at 2-3.)

As explained above, it is the ALJ's duty – before proceeding to steps four and five of the sequential analysis – to

assess a claimant's RFC. *See* 20 C.F.R. §§ 404.1545(a)(5)(i),
416.945(a)(5)(i). RFC is defined as:

> what an individual can still do despite his or her
> limitations . . . . Ordinarily, RFC is the individual's
> maximum remaining ability to do sustained work
> activities in an ordinary work setting on a regular and
> continuing basis, and the RFC assessment must include a
> discussion of the individual's abilities on that basis.
> A 'regular and continuing basis' means 8 hours a day,
> for 5 days a week, or an equivalent work schedule.

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-
8p, 1996 WL 374184, at *2 (July 2, 1996)). In assessing a
claimant's RFC, an ALJ must consider all of the claimant's
medically determinable impairments, including those that are not
found to be "severe." 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).
The RFC assessment must be based on "all of the relevant medical
and other evidence" in the case record, including "any statements
about what [the claimant] can still do that have been provided by
medical sources, whether or not they are based on formal medical
examinations." *Id.* §§ 404.1545(a)(3), 416.945(a)(3). The ALJ "will
also consider descriptions and observations of [the claimant's]
limitations from [the claimant's] impairment(s), including
limitations that result from [the claimant's] symptoms, such as
pain, provided by [the claimant], [the claimant's] family,
neighbors, friends, or other persons." *Id.* §§ 404.1545(a)(3),
416.945(a)(3). Finally, the ALJ must take into account a claimant's

"ability to meet the physical, mental, sensory, and other requirements of work." *Id.* §§ 404.1545(a)(4), 416.945(a)(4).

Plaintiff contends that the ALJ erred by not evaluating his RFC on a function-by-function basis. Plaintiff cites Social Security Ruling 96-8, which mandates that, before classifying a claimant's RFC based on exertional levels of work, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945."[8] SSR 96-8p, 1996

---

[8] Paragraphs (b), (c), and (d) of the relevant regulations read as follows:

(b) Physical abilities. When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

(c) Mental abilities. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work.

(d) Other abilities affected by impairment(s). Some medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions, may cause limitations and restrictions which affect other work-related abilities. If you have this type of impairment(s), we consider any resulting limitations and

WL 374184, at *1. The Ruling cautions that "a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions," which could lead to "an erroneous finding that the individual is not disabled." *Id.* at *4. Plaintiff argues that remand is warranted because the ALJ "failed to specifically and separately indicate [plaintiff's] capacity for sitting, standing, walking, lifting, carrying, pushing and pulling; functions required by all work regardless of exertional level." (Pl. Mem. at 13.)

The Second Circuit has expressly declined to recognize a "*per se* rule" requiring remand where an ALJ fails to conduct a function-by-function RFC analysis. *See Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013). Rather, the Second Circuit has instructed that the functions listed in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945 – which plaintiff submits must be separately assessed – are "only illustrative of the functions potentially relevant to an RFC assessment." *Id.* Remand may be appropriate, however, where "an ALJ fails to assess a claimant's capacity to perform relevant functions, despite

---

restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity.

20 C.F.R. §§ 404.1545(b)-(d), 416.945(b)-(d).

contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.*

Here, the ALJ determined that plaintiff had the RFC to perform "the full range of sedentary work." (Tr. 35-39.) The term "sedentary work" is defined in the regulations as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a). More specifically, "sedentary work generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day." *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (emphasis omitted) (internal quotation marks and citation omitted), *superseded by statute on other grounds*, 20 C.F.R. § 404.1560(c)(2).

The ALJ's determination that plaintiff could perform the "full range of sedentary work" was based on a lengthy summary of the record evidence, as well as the ALJ's own conclusions concerning plaintiff's credibility. (Tr. 35-39.) Plaintiff explicitly stated on a disability form that sitting was, for him, a "non-issue, depending on the length of time, maybe some constriction or tightening of the lower lumbar musculature." (Tr. 212.) As to standing, plaintiff stated on the same form that

standing was "not [too] much of an issue due to [his] past martial arts background" and told Dr. Sarreal that he "can stand [for] about two hours or more depending on the pain he felt on his right knee and leg." (Tr. 211, 331.) Plaintiff also informed Dr. Nguyen that he was practicing martial arts; Dr. Nguyen wrote that it was "unclear" why plaintiff was using a brace. (Tr. 277.) Plaintiff stated that he was capable of "moderate to competitive" walking and also that he walks to libraries between five and six days per week. (Tr. 212, 216.) He also told doctors at Lenox Hill Hospital, and testified at the hearing before the ALJ, that he was capable of and looking for sedentary work. (Tr. 57-58, 62, 64-65, 356.) Finally, as the ALJ noted, nearly all of the injuries claimed by plaintiff were in existence while he was working. (Tr. 39 ("It must be noted that there is evidence that the claimant stopped working for reasons not related to the allegedly disabling impairments. What is more, the record reveals that the claimant's allegedly disabling impairments were present while he was working.").)

The court is satisfied that substantial evidence supported the ALJ's determination of plaintiff's RFC. The ALJ appropriately assessed plaintiff's "capacity to perform relevant functions" and the ALJ's failure to perform a function-by-function assessment did not "frustrate meaningful review." *Cichocki*, 729 F.3d at 177. Accordingly, remand premised on the failure to perform

a function-by-function assessment would be inappropriate. *See Id.;*
*see also Skidds v. Colvin*, No. 13-CV-00894, 2016 WL 1162518, at
*1, *4 (N.D.N.Y. Mar. 23, 2016) (affirming denial of disability
insurance benefits despite ALJ's failure to perform function-by-
function RFC assessment, where ALJ's findings "could have been
more detailed" but still provided an adequate basis for meaningful
review and were supported by substantial evidence).

C.    *Additional Evidence Submitted to the Appeals Council Did
      Not Warrant Review of the ALJ's Decision*

Finally, plaintiff argues that the Appeals Council
should have remanded to the ALJ after considering "new and material
evidence" relating to his alleged disability. (Pl. Mem. at 14-15.)
The Commissioner argues that the Appeals Council did not err in
declining to review the case, because the additional evidence would
not have changed the ALJ's decision. (Def. Mem. at 22-23; Def.
Reply at 3-4.)

Social Security regulations provide that the Appeals
Council must consider "new and material evidence . . . where it
relates to the period on or before the [ALJ's] decision." 20 C.F.R.
§§ 404.970(b), 416.1470(b). Evidence is "new" if it was not
considered by the ALJ and is "not merely cumulative of what is
already in the record." *Jones v. Sullivan*, 949 F.2d 57, 60 (2d
Cir. 1991). To be "material," the evidence must be both "relevant
to the claimant's condition during the time period for which

benefits were denied and probative." *Id.* The concept of materiality also requires "a reasonable possibility that the new evidence would have influenced the Secretary to decide [a] claimant's application differently." *Id.* Evidence generated after the ALJ's decision may still be considered material, provided it relates to the time period for which benefits were denied. *See Newbury v. Astrue*, 321 Fed. App'x 16, 18 n.2 (2d Cir. 2009) ("For example, subsequent evidence of the severity of a claimant's condition may demonstrate that during the relevant time period, the claimant's condition was far more serious than previously thought." (internal quotation marks, citation, and alteration omitted)).

Where a plaintiff proffers new and material evidence, the regulations oblige the Appeals Council to "evaluate the entire record including the new and material evidence submitted . . . . The Appeals Council will then review the claim if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. §§ 404.970(b), 416.1470(b). Even if "the Appeals Council denies review after considering new evidence, the [Commissioner's] final decision necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence." *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996) (internal quotation marks and citation omitted). Additionally, evidence submitted to the Appeals Council after an ALJ's decision becomes part of the

administrative record for judicial review, even where – as here – the Appeals Council declines review. *Id.* The role of the district court is to determine if the Appeals Council erred when it determined that the new evidence was insufficient to trigger review of the ALJ's decision. *Hickman ex rel. M.A.H. v. Astrue*, 728 F. Supp. 2d 168, 182 (N.D.N.Y. 2010) (citation omitted).

Plaintiff submitted multiple items of additional evidence to the Appeals Council following the ALJ's decision. (Tr. 369-385.) In denying plaintiff's request for review for a second and final time, the Appeals Council stated that it had considered the additional evidence, but "found that this information does not provide a basis for changing the [ALJ's] decision." (Tr. 2.)

In challenging the Appeals Council's decision, plaintiff relies exclusively on the report of orthopedist Dr. Hepinstall. (*See* Pl. Mem. at 14-15.) Specifically, plaintiff contends that the additional evidence of his "treating orthopedist . . . is further supportive of [plaintiff's] contention that [his] musculoskeletal impairment is consistent with the criteria for listing 1.02A." (*Id.* at 14.)

As a preliminary matter, plaintiff mischaracterizes Dr. Hepinstall as a "treating" physician. It is well-settled that the medical opinions of a claimant's treating physician are entitled to a "measure of deference." *Torres v. Comm'r of Soc. Sec.*, No. 14-CV-6712, 2015 WL 7281640, at *5 (E.D.N.Y. Nov. 16, 2015)

(citation omitted); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) . . . .").[9] The regulations define a "treating source" as a claimant's "own physician, psychologist, or other acceptable medical source who provides . . . or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §§ 404.1502, 416.902. An "ongoing treatment relationship" generally exists where a medical source has seen the patient "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the patient's] medical condition(s)." *Id.* §§ 404.1502, 416.902.

Here, Dr. Hepinstall did not have the requisite ongoing treatment relationship with plaintiff and thus cannot be considered a "treating source." There is no evidence in the record to suggest any contact between Dr. Hepinstall and plaintiff before the "initial consultation" of July 11, 2012. (Tr. 382.) Although a letter from Dr. Hepinstall dated September 27, 2012 describes

---

[9] The "treating physician rule" applies with equal force to the Appeals Council, which must provide "good reasons" when rejecting a treating source's medical opinion submitted as new and material evidence. *James v. Comm'r of Soc. Sec.*, No. 06-CV-6180, 2009 WL 2496485, at *10 (E.D.N.Y. Aug. 14, 2009) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

plaintiff as a "patient . . . currently under my care," it does not refer to any doctor-patient interaction beyond the July 2012 evaluation. (Tr. 385 ("I evaluated Mr. Carter in July of 2012.").) The court therefore disagrees with plaintiff's description of Dr. Hepinstall's report as a "treating opinion."

More fundamentally, plaintiff's claim that Dr. Hepinstall's report undermines the ALJ's finding at step three is unfounded. As the Commissioner correctly observed, the report itself adds little to the existing record. (Def. Reply at 4.) The report's most notable statement is Dr. Hepinstall's recommendation that plaintiff undergo a hip and knee replacement surgery. (Tr. 384-85.) The suggestion of surgery may underscore the severity of plaintiff's impairments, but it brings him no closer to a finding of *per se* disability. As noted above, even if plaintiff could satisfy the listing's threshold criteria, there was substantial evidence before the ALJ demonstrating plaintiff's failure to satisfy the ineffective ambulation criterion of Listing 1.02A. Dr. Hepinstall's report does not meaningfully challenge the conclusion that plaintiff could effectively ambulate. Indeed, the report even undermines plaintiff's ineffective ambulation claim, noting plaintiff's attempt "to maintain an active lifestyle given his youth." (Tr. 382.) The nearest the report comes to assessing whether plaintiff is able to ambulate effectively is an observation regarding plaintiff's "severely abnormal gait." (*Id.*) Evidence of

plaintiff's abnormal gait, however, was already contained in the record. (Tr. 357 ("gait is abnormal"); *but see* Tr. 178 ("normal gait").). Nothing else in Dr. Hepinstall's report is probative of plaintiff's "inability to ambulate effectively," as defined in the regulations. Accordingly, the Appeals Council did not err when it determined that the additional evidence was insufficient to disturb the ALJ's decision.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings is GRANTED and plaintiff's motions for judgment on the pleadings is DENIED. The Clerk of Court is respectfully requested to dismiss this action, enter judgment in favor of defendant, and close this case.

**SO ORDERED.**

Dated: June 9, 2016
      Brooklyn, New York

_____/s/_____
KIYO A. MATSUMOTO
United States District Judge